**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| SPRINGBOARDS TO EDUCATION, INC. | § | |
| Plaintiff, | § | |
| | § | |
| v | § | |
| | § | CIVIL ACTION NO.: _____ |
| REGION ONE EDUCATION SERVICE | § | |
| CENTER, NORA GALVAN, BRENDA | § | |
| HUSTON, J. ANN VEGA, Dr. LAURA | § | |
| SHENEMAN, SYLVIA IBARRA, | § | |
| SCHOLASTIC BOOK FAIRS, INC., | § | |
| SCHOLASTIC CORPORATION, and | § | |
| HOUGHTON MIFFLIN HARCOURT | § | |
| PUBLISHING CO. | § | JURY TRIAL DEMANDED |
| Defendants. | § | |
| | § | |

## ORIGINAL COMPLAINT

Springboards to Education, Inc. ("Springboard," "Springboards," or "Plaintiff") for

its claims against Defendants: Region One Education Service Center ("ESC"), Nora Galvan

("Galvan"), Brenda Huston ("Huston"), J. Ann Vega ("Vega"), Dr. Laura Sheneman ("Dr.

Sheneman"), Sylvia Ibarra ("Ibarra"), Scholastic Book Fairs, Inc. ("SBF"), Scholastic

Corporation ("Scholastic"), and Houghton Mifflin Harcourt Publishing Co. ("HMH")

(collectively "Defendants"), respectfully alleges as follows:

## NATURE OF ACTION

1.      This is an action at law and in equity for: trademark counterfeiting; trademark

infringement; trademark dilution; unfair competition arising from Defendants' unauthorized

use of Springboard's federally registered trademark; and wrongful collective action under

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.

Springboard is the exclusive owner of all the trademark rights in and to the Springboards

Trademarks (as referenced and outlined below and shown in Exhibit A, the "Trademarks")

for various goods and services related to the educational field.

2.     Springboard offers for sale reading programs and related educational

products.  The Trademarks are uniquely associated with the Springboard brand and have

come to symbolize the exceptional quality that consumers can expect from Springboard as

the source of such products and services.  Accordingly, Springboard enjoys strong consumer

loyalty, recognition, and goodwill in the educational field and its related marketplace.

3.     Springboard's claims in the present action arise from Defendants'

unauthorized manufacture, production, distribution, advertisement, promotion, marketing,

offering for sale, and/or sale of educational products and services bearing the Trademarks.

Upon information and belief, Defendants are major infringers of the Trademarks:

Defendants both sell and distribute their counterfeit versions directly to the consuming

public, on a large scale, as to confuse the consumers as the origin of the infringing products

and services.

4.      Defendants are not connected or affiliated with Springboard in any way, nor do Defendants have permission from Springboard to use any of its Trademarks or any other intellectual property belonging to Springboard.  Rather, Defendants are blatantly exploiting the Trademarks for their own commercial gain, intending to confuse and deceive the public by drawing on Springboard's goodwill in the marketplace.  By offering for sale and distributing the infringing products and services, Defendants intend to, are likely to, and do cause confusion and deceive consumers and the public regarding the source of Defendants' merchandise, all to the detriment of Springboard.

## THE PARTIES

5.      Springboards to Education, Inc. is a corporation organized and existing under the laws of the State of Texas, having its principal place of business at 3802 South Highway 281, Edinburg, Texas 78539.

6.      Scholastic Book Fairs, Inc. is a corporation duly organized and existing under the laws of the State of Florida and, upon information and belief, maintains a principal place of business at 1080 Greenwood Boulevard, Lake Mary, Florida, 32746.  Scholastic Book Fairs, Inc. is a subsidiary of Scholastic Corporation.  SBF sells and distributes its publications in the Northern District of Texas and throughout the United States, including infringing

publications and materials at issue in which Plaintiff's property is/are unlawfully reproduced.

At all times pertinent to the allegations herein, SBF acted through and in concert with its

various imprints, divisions, partners, subsidiaries, predecessors, and affiliates.

7.      Scholastic Corporation is a corporation duly organized and existing under the

laws of the State of Delaware and, upon information and belief, maintains a principal place

of business at 557 Broadway, New York, New York, 10012.

8.      Houghton Mifflin Harcourt Publishing Co. is a corporation duly organized and

existing under the laws of the State of Massachusetts and does business at 2700 La Frontera

Boulevard, Round Rock, Texas 78681 and, upon information and belief, maintains a

principal place of business at 222 Berkeley Street, Boston, Massachusetts, 02116.   HMH

sells and distributes its publications in the Northern District of Texas and throughout the

United States, including infringing publications and materials at issue in which Plaintiff's

property is/are unlawfully reproduced. At all times pertinent to the allegations herein, HMH

acted through and in concert with its various imprints, divisions, partners, subsidiaries,

predecessors, and affiliates.

9.      Region One Education Service Center is organized and existing under the laws of the State of Texas, having its principal place of business at 1900 West Schunior Street, Edinburg, Texas 78541.

10.      Upon information and belief, Nora Galvan is a resident under the laws of Texas having a business address of at 601 East Kelly, Pharr, Texas 78577.

11.      Upon information and belief, Brenda Huston is a resident under the laws of Texas having a business address of at 2000 North 23rd Street, McAllen, Texas 78501.

12.      Upon information and belief, J. Ann Vega is a resident under the laws of Texas having a business address of 2000 North 23rd Street, McAllen, Texas 78501.

13.      Upon information and belief, Dr. Laura Sheneman is a resident under the laws of Texas having a business address of 1900 West Schunior Street, Edinburg, Texas 78541.

14.      Upon information and belief, Sylvia Ibarra is a resident under the laws of Texas having a business address of 2000 North 23rd Street, McAllen, Texas 78501.

15.      Upon information and belief, through their conduct, as detailed below, the Individual Defendants (or "Conspirators") conducted or participated, directly or indirectly, or engaged in the affairs of an enterprise, the ESC, through a pattern of racketeering activity,

and/or conspired to do so, in violation of RICO, which activities affected and continue to affect, interstate or foreign commerce. The Conspirators' scheme to violate Plaintiff's rights will hereinafter be referred to as the "Conspiracy." RICO prohibits a person associated with an enterprise from conducting the enterprise's affairs through a pattern of racketeering.

16.     The Individual Defendants, along with the ESC, Scholastic, SBF, and HMH, collectively are an association-in-fact which, thus, constitutes an "enterprise" which affected interstate commerce, within the meaning of 18 U.S.C. § 1961(4). Upon information and belief, through their conduct, as detailed below, all Defendants conducted or participated, directly or indirectly, or engaged in the affairs of their association-in-fact enterprise through a pattern of racketeering activity, and/or conspired to do so, in violation of RICO; the activities of the association-in-fact enterprise affects, interstate or foreign commerce. RICO prohibits a person associated with an enterprise from conducting the enterprise's affairs through a pattern of racketeering.

## JURISDICTION AND VENUE

17.     Springboards files this action against Defendants for trademark counterfeiting, trademark infringement, and trademark dilution under the Lanham (Trademark) Act of 1946, 15 U.S.C. § 1051 *et seq.* (the "Lanham Act"), and related claims of unfair competition under

the statutory and common law of the State of Texas.   This Court has subject matter jurisdiction over the trademark claims under 28 U.S.C. §§ 1331 and 1338(a).

18.   This U.S. District Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs complain under 18 U.S.C. § 1961, *et seq.* (civil-RICO); and are related to the same transactions or occurrences and implicate the same questions of fact and related questions of law.

19.   This Court has supplemental jurisdiction over the state law claims in this Complaint which arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

20.   This Court has personal jurisdiction over Defendants because Defendants transact a sufficient amount of business within the state of Texas and within this District.

21.   Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this district.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Springboard Trademarks

22.     Springboard designs, markets, and sells reading and related products under the Springboard brand and its associated Trademarks, including, but not limited to, motivational products that the purchaser awards to students upon achievement of the requisite thresholds.

23.     Springboard is the owner of the entire right, title, and interest in and to various trademark registrations and applications for the Springboard brand for a variety of goods and services, including, but not limited to, the following U.S. trademark registrations (all certificates attached in Exhibit A):  Millionaire Reader® (U.S. Reg. No. 4,080,513); Million Dollar Reader® (U.S. Reg. No. 4,291,796); Millionaire's Reading Club® (U.S. Reg. No. 4,162,765); and Read A Million Words® (U.S. Reg. No. 3,955,345).

24.     The foregoing registrations are valid, subsisting, and in full force and effect.

25.     Additionally, Springboard has common law trademark rights in the Springboard unregistered trademarks for use in connection with products and services in the educational field and other related fields.

26.     Springboard began offering to sell, marketing, and selling products and services bearing the Springboard Trademarks at least as early as 2005.

27.     Springboard maintains strict quality control standards for all goods and services under the Springboard brand and Trademarks.

28.     Each year, Springboard spends substantial resources in marketing and promoting the Springboard brand and Trademarks, and sells hundreds of thousands of dollars of goods and services bearing the Springboard brand and Trademarks.

29.     As a result of Springboard's exclusive and extensive use and promotion of the Springboard brand and Trademarks for many years, the marks have acquired enormous value and recognition in the United States and elsewhere throughout the world, all of which inures to the benefit of Springboard. Consumers, potential customers, and other members of the public not only associate the Springboard brand and Trademarks with exceptional materials, style, and workmanship approved by Springboard, but also recognize that goods and services bearing the Springboard brand and Trademarks originate exclusively with Springboard. Accordingly, the Springboard brand and Trademarks are symbols of Springboard's quality, reputation, and goodwill and serve as instant source identifiers for Springboard's products.

## CIVIL-RICO CLAIMS

30.     Throughout the allegations herein, the participants include the individual defendants and the organizational defendants.

31.     The Individual Defendants have engaged in a course of conduct, of, by, or through an enterprise, through a pattern of racketeering activity as discussed below, the evidence of which is largely if not uniquely within Defendants' possession, constituting civil RICO violations.  On information and belief, Defendants' scheme and enterprise was conducted through the U.S. Mail and the internet, both statewide and nationwide.  Because evidence of Defendants' scheme—a scheme spanning at least a decade, since 2006—is uniquely within Defendants' possession, Plaintiff requires discovery on the specific details of the who, what, where, and how underlying Defendants' long-running and well-concealed scheme.  The overall scheme is straightforward: disenfranchise Plaintiff of its property interest and protected rights in contravention of federal statutes protective of those rights and execute the scheme though the U.S. Mail and the internet, all under an express or implied agreement(s) to cut Plaintiff out by any means necessary. Otherwise, the who, what, where, and how are:

a. Who: Galvan, Huston, Vega, Sheneman, Ibarra, Pharr-San Juan-Alamo Independent School District, McAllen Independent School District, Region One Education Service Center, Scholastic Book Fairs, Inc., Scholastic Corporation, and Houghton Mifflin Harcourt Publishing Co.;

b. What: Defendants' coordinated efforts to misappropriate Plaintiff's product and re-brand them as Defendants' own (or otherwise authorized use) in violation of intellectual property laws— –all through prohibited and unlawful means.  The Individual Defendants and ESC knowingly engaged in a scheme to intentionally defraud Plaintiff out of sales and profits through Defendants' distribution, production, and sales of its inferior knock-off(s). The Individual Defendants and ESC knowingly engaged in a scheme to intentionally defraud consumers.  All Defendants knowingly engaged in a scheme to intentionally defraud Plaintiff out of sales and profits through Defendants' participation in wrongful and unlawful distribution, production, and sales of inferior knock-off(s).  All Defendants knowingly engaged in a scheme to intentionally defraud consumers;

c. When: As early as 2006 through to 2016; and

d. Where: South Texas, the Region One Education Service Center area, Cameron County, Hidalgo County (Pharr-San Juan-Alamo Independent School District, McAllen Independent School District), Jim Hogg County, Starr County, Webb County, Willacy County, and Zapata County.

32.    In 2013, Scholastic and SBF met with Defendant Ibarra (who at the time served as McAllen Independent School District's Assistant Superintendent of Curriculum and Instruction)

and discussed how Scholastic and SBF could and would utilize Plaintiff's protected property and

how the assistant superintendent could and would assist Scholastic and SBF in promoting their

infringing version(s) of Plaintiff's product/property.   From 2013 to the present, Scholastic and

SBF have been encouraged, aided, and abetted schools, school districts, and other intermediaries

to infringe on Plaintiff's property by among other things, assisting and guiding in the creating of

counterfeit or knock-off products.

33.     Since at least 2006, Scholastic has sold to Texas schools and the Defendants

discussed above what it calls "Read 180," Scholastic's *infringing* version of Plaintiff's intellectual

property.   On or about May 29, 2015, Scholastic divested itself of "Read 180" by conveying that

product/program to HMH.   Since May 2015, HMH has sold to Texas schools and the Defendants

discussed above both "Read 180" and later what it calls "Read 180 Universal" HMH's *infringing*

version of Plaintiff's intellectual property.

34.     By law, there can be no ownership of a trademark in any term that has not been

used exclusively by the would-be owner.   That is because the purpose of trademarks is to identify

the source of the goods, and if the term is also used by unrelated sources, no trademark exists.

This is true no matter whether the term is inherently distinctive or not.   If the term is used non-

exclusively, it cannot be a trademark.   Therefore, if an applicant knows, after reasonable inquiry,

that a term has also been used continuously by one or more competitors for a significant time, the applicant cannot honestly swear that the applicant is the owner of the term and that no other person has any rights to the term.  This duty is imposed on the applicant because the government wants to keep junk trademarks out of its registries.  Willful ignorance and unrealistic assessments are not allowed.   Trademark rights arise from exclusive continuous use, not from scattershot trademark applications.

35.    The complained-of unlawful activities are ongoing.  The doctrine of continuing tort or injury applies to the claims here except for the civil-RICO and patent-false-marking claims. Several of the unlawful activities complained of here were first perpetrated in 2007, their discovery, however, would be hampered and concealed by the Defendants, who in some instances deleted entire swaths of records and evidence of their knowledge and introduction to Plaintiff's business and proprietary property, products, and services. Others of the unlawful activities were first perpetrated more than four years and less than ten years ago, but are continuations of an ongoing pattern of unlawful activity. Therefore, there is no time bar to this action other than the ten-year outer limit for civil-RICO and the outer limit for patent false marking.

**Standing to Sue Under Civil-RICO Claims**

36.     Plaintiff's standing to bring civil-RICO claims will be established by its showing Defendants' pattern of violation(s) of 18 U.S.C. § 1962 *et seq.*, with such violations directly causing injury to Plaintiff's business or property, which Plaintiff alleges here and set forth with the required specificity herein under each separate count.

37.     Plaintiff's standing to bring claims under the federal Lanham Act, and state unfair-competition and trade-practices law, is established by the business-competitor, distributor, or business-customer relationships among the parties, by present activity, which could constitute infringement, or concrete steps taken with the intent to conduct such activity, as set forth in detail herein.

38.     The Individual Defendants and ESC knowingly engaged in a scheme to intentionally defraud consumers and the public through unauthorized use of the Trademark, effectively claiming the quality, characteristics, and/or content of their counterfeited material are the Trademark products and/or the same as the Trademark products.

39.     The Individual Defendants and ESC knowingly engaged in a scheme to intentionally defraud Plaintiff out of sales and profits through Defendants' use and sales of inferior knock-off(s).

40.     In intentional furtherance of this scheme, the Individual Defendants and ESC used the Internet to disseminate Defendants' inferior knock-offs to end-users and consumers across South Texas, and to enable end-users and consumers to purchase the counterfeit materials online. The evidence of Defendants' use of the internet is largely if not uniquely within Defendants' possession, thus Plaintiff is presently unable to proffer specific prima facie proof other than that gleaned from screen-shots/images of Defendants' web page(s).

41.     In intentional furtherance of this scheme, the Individual Defendants and ESC also used the U.S. Mail and/or other interstate carriers to ship counterfeit materials to purchasing end-users or consumers throughout South Texas.  The evidence of Defendants' use of the U.S. Mail and/or other interstate carriers is uniquely within Defendants' possession, thus Plaintiff is presently unable to proffer prima facie proof.

42.     The Individual Defendants agreed with each and others associated with and employed by the ESC to participate in and facilitate the fraudulent scheme set forth in herein and had actual knowledge of the ESC's fraudulent activities set forth herein.

43.     Defendants' fraudulent activities described herein deceived consumers into believing their knock-off was a quality protein product like Plaintiff's products, goods, and

services, and caused and enabled consumers to acquire, purchase, use and accept the knock-off(s) instead of Plaintiff's products, goods, and services.

44.     As a direct and proximate cause of Defendants' schemes and fraudulent activities set forth herein, Plaintiff sustained injury to its business and property in the form of lost or diverted sales, competitive advantages, and goodwill in its Trademark.

## Distinct Civil-RICO Person(s)

45.     Each of the Defendants is an entity capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. § 1961(3).  The Defendants all either pose(s) or have posed a continuous threat of engaging in acts of racketeering.  Defendants' overarching plan included as a goal, the result of absconding with Plaintiff's protected property, reproducing it under the guise of their own creation and redistributing it to the end-user.  Defendants' overarching plan was executed: on a student-by-student basis, thousands of times since 2006; on an annual basis, each school year since 2006; on a school-by-school basis, multiple of times since 2006; the instances of violations are too numerous to itemize.  Defendants are associated and affiliated with each other through their association-in-fact, and in violation of 18 U.S.C. § 1962(c), conduct the association's affairs through a pattern of racketeering.  Defendants conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

46.     Defendant Galvan is the District Library Coordinator for the Pharr-San Juan-Alamo Independent School District which utilizes ESC sourced products.  Galvan's conduct was ongoing and continuous as she engaged in multiple racketeering acts/activities since first being introduced to Plaintiff and its offerings in 2006.  On belief and information largely if not uniquely within Galvan's possession, Galvan's wrongful conduct has been ongoing since 2006, since that time: Galvan has on an annual basis, unlawfully reproduced and spread both through the U.S. Mail and the internet, the knock-offs throughout the school districts in the ESC; Galvan has coordinated and participated in Defendants' agreed-to destruction of documents, emails, and other evidence showing the origins of the knock-offs from Plaintiff; Galvan has aided and abetted (providing guidance and assistance to consumers and) others in their reproduction and redistribution of the counterfeit items; Galvan has provided training to unwitting re-infringers on their presentation and use of the counterfeit items.  The predicate acts alleged in the Claims for Relief and wrongful conduct, *infra* at 25 ¶¶ 64 *et seq.*, (1) have been ongoing for nearly a decade; (2) are supported by information largely if not uniquely within Galvan's possession; and (3) are incorporated by reference as if fully set forth herein.  More and detailed specificity is largely if not uniquely within Galvan's and ESC's possession.

47.     Defendant Huston is the Library Services Coordinator for the McAllen Independent School District which utilizes ESC sourced products.  The predicate acts alleged in the Claims for Relief, and wrongful acts, *infra* at 25 ¶¶ 64 *et seq.*, (1) have been ongoing for nearly a decade; (2) are supported by information largely if not uniquely within Huston's possession; and (3) are incorporated by reference as if fully set forth herein.  More and detailed specificity is largely if not uniquely within Huston's and ESC's possession.  Huston's conduct was ongoing and continuous as she engaged in multiple racketeering acts/activities since first being introduced to Plaintiff's offerings.  On belief and information largely if not uniquely within Huston's possession, Huston's wrongful conduct has been ongoing since 2006, since that time: Huston has on an annual basis, unlawfully reproduced and spread both through the U.S. Mail and the internet, the knock-offs throughout the school districts in the ESC; Huston has coordinated and participated in Defendants' agreed-to destruction of documents, emails, and other evidence showing the origins of the knock-offs from Plaintiff; Huston has aided and abetted (providing guidance and assistance to consumers and) others in their reproduction and redistribution of the counterfeit items; Huston has provided training to unwitting re-infringers on their presentation and use of the counterfeit items.

48.     Defendant Vega is Director of Instructional Technology at McAllen Independent School District which utilizes ESC sourced products.   Vega's conduct was ongoing and continuous as she engaged in multiple racketeering acts/activities since first being introduced to Plaintiff's offerings in 2006.   On belief and information largely if not uniquely within Vega's possession, Vega's wrongful conduct has been ongoing since 2006, since that time: Vega has on an annual basis, unlawfully reproduced and spread both through the U.S. Mail and the internet, the knock-offs throughout the school districts in the ESC; Vega has coordinated and participated in Defendants' agreed-to destruction of documents, emails, and other evidence showing the origins of the knock-offs from Plaintiff; Vega has aided and abetted (providing guidance and assistance to consumers and) others in their reproduction and redistribution of the counterfeit items; Vega has provided training to unwitting re-infringers on their presentation and use of the counterfeit items.   The predicate acts alleged in the Claims for Relief and wrongful conduct, *infra* at 25 ¶¶ 64 *et seq.*, (1) have been ongoing for nearly a decade; (2) are supported by information largely if not uniquely within Vega's possession; and (3) are incorporated by reference as if fully set forth herein.   More and detailed specificity is largely if not uniquely within Vega's and ESC's possession.

49.     Defendant Dr. Sheneman is the Coordinator of Library Services and Information Resources for the ESC.  The predicate acts alleged in the Claims for Relief and wrongful acts, *infra* at 25 ¶¶ 64 *et seq.*, (1) have been ongoing for nearly a decade; (2) are supported by information largely if not uniquely within Sheneman's possession; and (3) are incorporated by reference as if fully set forth herein.  More and detailed specificity is largely if not uniquely within Sheneman's and ESC's possession.  Sheneman's conduct was ongoing and continuous as she engaged in multiple racketeering acts/activities since first being introduced to Plaintiff's offerings.  On belief and information largely if not uniquely within Sheneman's possession, Sheneman's wrongful conduct has been ongoing since 2006, since that time: Sheneman has on an annual basis, unlawfully reproduced and spread both through the U.S. Mail and the internet, the knock-offs throughout the school districts in the ESC; Sheneman has coordinated and participated in Defendants' agreed-to destruction of documents, emails, and other evidence showing the origins of the knock-offs from Plaintiff; Sheneman has aided and abetted (providing guidance and assistance to consumers and) others in their reproduction and redistribution of the counterfeit items; Sheneman has provided training to unwitting re-infringers on their presentation and use of the counterfeit items.

50.     Defendant Ibarra is the McAllen Independent School District's Assistant Superintendent of Curriculum.  The predicate acts alleged in the Claims for Relief and wrongful acts, *infra* at 25 ¶¶ 64 *et seq.*, (1) have been ongoing for nearly a decade; (2) are supported by information largely if not uniquely within Ibarra's possession; and (3) are incorporated by reference as if fully set forth herein.  More and detailed specificity is largely if not uniquely within Ibarra's and ESC's possession.  Ibarra's conduct was ongoing and continuous as she engaged in multiple racketeering acts/activities since first being introduced to Plaintiff's offerings.  On belief and information largely if not uniquely within Ibarra's possession, Ibarra's wrongful conduct has been ongoing since 2006, since that time: Ibarra has on an annual basis, unlawfully reproduced and spread both through the U.S. Mail and the internet, the knock-offs throughout the school districts in the ESC; Ibarra has coordinated and participated in Defendants' agreed-to destruction of documents, emails, and other evidence showing the origins of the knock-offs from Plaintiff; Ibarra has aided and abetted (providing guidance and assistance to consumers and) others in their reproduction and redistribution of the counterfeit items; Ibarra provided training to unwitting re-infringers on their presentation and use of the counterfeit items, before she turned over her role as head to Sheneman when then provided training to unwitting re-infringers on their presentation and use of the counterfeit items..

51.     The Individual Defendants are persons distinct from the ESC enterprise, which further comprises other persons with various employment, contractor, or supplier relationships.

52.     The Individual Defendants engaged in trafficking of goods and services bearing counterfeit marks in violation of the law including, but not limited to, 18 U.S.C. § 2320.

### Distinct Civil-RICO Enterprise(s)

53.     Detailed evidence of the enterprise's operations and conduct is largely if not uniquely within the enterprise's possession.   Detailed evidence of the ESC's operations and conduct is largely if not uniquely within the ESC's possession.

54.     The ESC is an entity, like Plaintiff, that provides to its end-user or consumer, reading programs and related educational products that the provider manufactures, produces, distributes, advertises, promotes, markets, and offers for sale educational products and services bearing the Trademarks.  The ESC's end-user or consumer includes both school districts and the consuming public at large.

55.     The ESC is an entity providing media resources and materials to 37 school districts and 10 charter school systems in the seven Texas county areas of Cameron County, Hidalgo County, Jim Hogg County, Starr County, Webb County, Willacy County, and Zapata County.

56.     All of the various aspects of the ESC are presented to the public as one single entity or enterprise accessed through a single facility at 1900 West Schunior Street, Edinburg, Texas 78541, through a single internet website, a single toll-free telephone number, and a single fax number.

57.     The ESC enterprise (or any affiliated enterprises) comprise other persons with various employment or contractor relationships, a meeting facility at 1900 West Schunior Street, Edinburg, Texas 78541, manufacturing, packaging, and shipping facilities, toll-free telephone and fax order-taking facilities, internet order-processing facilities, and facilities for generating marketing and promotional material, and the headquarters location at 1900 West Schunior Street, Edinburg, Texas 78541.  The inner working and operation structure of the ESC is largely if not uniquely within the ESC's possession, whose precise details are obscured.

58.     The enterprise or enterprises have an existence apart from and beyond the racketeering activity complained of in this action, and are an entity or entities distinct from the Individual Defendants: Galvan, Huston, Vega and Dr. Sheneman.

59.     The ESC engaged in trafficking of goods and services bearing counterfeit marks in violation of the law including, but not limited to, 18 U.S.C. § 2320.

60.     Together, all Defendants engaged in trafficking of goods and services bearing

counterfeit marks in violation of the law including, but not limited to, 18 U.S.C. § 2320.

61.     Common Purpose: Defendants were at the core of the enterprise, which used their

contacts and relationships with clients (schools, school districts, educational institutions) to

effectuate its scheme(s).   The Defendants shared a common goal—to induce consumers to

purchase their infringing version of Plaintiff's property/product instead of Plaintiffs; to avoid

paying Plaintiff any compensation for Defendants' wrongful use of Plaintiff's property/product;

and to sell and distribute their infringing version of Plaintiff's property/product through the U.S.

Mail and through the internet.

62.     The enterprise—consisting of all Defendants/Defendants' coordinated efforts—,

like Plaintiff, provides to its end-user or consumer, reading programs and related educational

products that the provider manufactures, produces, distributes, advertises, promotes, markets, and

offers for sale educational products and services bearing the Trademarks.   The enterprise's end-

user or consumer includes both school districts and the consuming public at large.

63.     Organization: Defendants are the persons within the enterprise and have clear and

interrelated roles.   Ibarra took the initial role as head, followed by Sheneman and eventually

Scholastic (and later HMH); each taking turns at the top of the hierarchy.   Scholastic is the parent

company and coordinates the efforts of SBF.  Other members of the enterprise include: the ESC,

Galvan, Huston, Vega, Dr. Sheneman.  All the members of the organization are linked together

by a network of contracts, transactions and pay-offs, orchestrated at first by Ibarra, then Sheneman

then by Scholastic and HMH.  With Scholastic and HMH at the top and all its agents and delegates

below including the above-referenced un-named defendants down through to the individual hand-

delivering infringing property to a student or parent, the entirety of the organization is complete.

64.   Continuity: The enterprises' affairs have been ongoing since at least 2006, or as

discovery will reveal, since the first instance of infringement.  The enterprises' overarching plan

was executed: on a student-by-student basis, thousands of times since 2006; on an annual basis,

each school year since 2006; on a school-by-school basis, multiple of times since 2006; the

instances of violations are too numerous to identify and itemize without discovery into the

enterprise's records.

**Defendants' Infringing Activities**

65.   Upon information and belief, Defendants are manufacturing, advertising,

promoting, distributing, offering for sale, and/or selling the products and/or services bearing

marks and/or branding that is confusingly similar to and/or resembling the Springboards

brand and Trademarks ("Counterfeit Products" or "Counterfeits") throughout at least Texas and most likely the United States.

66.     The breadth of Defendants' counterfeiting is extensive, as Defendants have sold at least thousands of pieces of Counterfeit Products.   Representative examples of Defendants' activities include, but are not limited to, the examples in Exhibit B.

67.     Specifically, Defendant Dr. Sheneman is and should be familiar with the Trademarks and brand.  Dr. Sheneman had previously purchased Springboard products from the company, and is directly, willfully and in bad faith infringing and inducing others to infringe Springboard's Trademarks.

68.     Upon information and belief, Defendants continue to offer the Counterfeit Products for sale.

69.     Defendants are not authorized and never have been authorized by Springboard to produce, manufacture, distribute, advertise, offer for sale, and/or sell merchandise bearing the Springboard brand and Trademarks, or any variations thereof.

70.     The authorization of Dr. Sheneman by Springboard only extended to the very limited past purchase of products by her while she was in a previous role than she is currently.

71.     Upon information and belief, the Defendants' Counterfeit Products are of a quality substantially inferior to the Springboard brand and Trademarks.

72.     Upon information and belief, Defendants are aware of the extraordinary fame and strength of the Springboard brand and Trademarks, and the goodwill associated therewith. Upon information and belief, Defendants had access to the Springboard brand and Trademarks prior to Defendants' creation and sale of the Counterfeit Products.

73.     Upon information and belief, Defendants are actively using, promoting, and otherwise advertising, distributing, selling, and/or offering for sale substantial quantities of Counterfeit Products with the knowledge that such goods will be mistaken for genuine Springboard Products.

74.     Upon information and belief, Defendants are conducting their counterfeiting and infringing activities within the United States.

75.     Defendants' use of unauthorized reproductions of Springboard brand and Trademarks in connection with the manufacturing, advertising, promoting, distributing, offering for sale, and/or selling of the Counterfeit Products is likely to cause confusion, deception, and mistake in the minds of consumers, the public, and the trade. Defendants'

wrongful conduct is likely to create a false impression and deceive customers, the public, and the trade into believing there is a connection or association between genuine Springboard Products and Defendants' Counterfeit Products.

76.     Defendants are engaging in the above-described illegal counterfeiting knowingly and intentionally or at least with reckless disregard or willful blindness to Springboard's rights for the purpose of trading on the goodwill and reputation of Springboard. If Defendants' intentional counterfeiting and infringing activities are not permanently enjoined by this Court, Springboard and the consuming public will continue to be damaged.

77.     Defendants have violated the provisions 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the conduct of the affairs of an enterprise or enterprises, through a pattern of racketeering activity, as further set forth with the required specificity under each separate count.

78.     Defendants' pattern of racketeering activity has continued and escalated for more than 4 years, and continues through the present day.

79.     The pattern of Defendants' violation of 18 U.S.C. § 1962(c) has caused injury in

the business and property of Plaintiff as contemplated by 18 U.S.C. § 1964(c), as further set forth

with the required specificity under each separate count.

**Summary Allegation & Characterization of Civil-RICO Injury**

80.     Plaintiff suffered injury to its business or property, and damages, including

economic or financial damages, proximately caused by Defendants' unlawful actions, as further

set forth with the required specificity under each count.

81.     The damages here are greater than just the sum of damages from each bad action

considered in isolation, because purchases are made in consolidated form for convenience and

cost savings, and therefore purchasing decisions based on either false assertions of exclusive

rights to sell individual products or false assertions of origin, including the Trademarked items

themselves, and exclusive components therein, have a multiplying effect.   As an example,

individual schools may purchase any single or packaged item offered by Plaintiff directly from

Plaintiff, but it is more convenient and less costly to purchase multiple or bulk offerings (of

Plaintiff) in or by a single district.   Also, many schools initially perform research, make their

initial decisions from whom to purchase their materials and initial stock, and then stay with that

source until motivated to do otherwise.

82.     Defendants' fraudulent scheme complained of here is fraud upon everyone.  It is fraud upon the purchasers and end-users of the Trademarked products (the counterfeits Defendants have conjured), because they are falsely told that Defendants' own government-sanctioned patents and trademarks are otherwise authorized distributors.  It is fraud against the providers (the schools and districts) of the Trademarked products, because they are led to believe they are protected in their use and distribution of Counterfeits and are led to believe they can promote the Counterfeits as their own.

83.     Springboard has no adequate remedy at law.

84.     Springboard is suffering irreparable injury and has suffered substantial damages as a result of the Defendants' counterfeiting and infringing activities.

85.     The injuries and damages sustained by Springboard have been directly and proximately caused by the Defendants' wrongful reproduction, use, manufacture, design, distribution, advertisement, promotion, offering to sell, and sale of their Counterfeit Products.

**Defendants' Bad-Faith Attempts to Cover Up Past Infringement**

86.     Upon information and belief, Defendants have and continue to attempt to hide evidence of their past infringement in order to avoid allegations of intentional and willful infringement against state and federal law.

87.     Other suits have been filed that are related to and stemming from the same Trademarks involved in the current action.  These suits have put Defendants on notice of their infringement.  These suits also include defendants named in the instant action—these defendants have already received litigation hold letters informing them of their duties to not destroy evidence pertaining to the litigation.

88.     In an order to hide their past infringement they have deleted Board Meeting minutes, previously posted on [www.esc1.net](http://www.esc1.net) that showed that there was a district and schoolwide reading campaign named "Millionaire Reading". Now the minutes have been removed and the hyperlinks are dead. (See Exhibit C)

89.     This is one specific instance of their destruction of evidence, but there is a multitude more.

90.     Section 551.022 of the Government Code provides: The minutes and recordings of an open meeting are public records and shall be available for public inspection

and copying on request to the governmental body's chief administrative officer or the officer's designee.  Defendants could possibly face violations of the Open Meetings Act.

## FIRST CLAIM FOR RELIEF

### (Trademark Counterfeiting — 15 U.S.C. § 1114)

91.     Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

92.     The registrations embodying the Springboard brand and Trademarks are in full force and effect, and the Springboard brand and Trademarks are entitled to protection under both federal law and common law.

93.     Defendant, without authorization from Springboard, has used and is continuing to use spurious designations that are identical to, or substantially indistinguishable from, the Springboard brand and Trademarks in interstate commerce.

94.     The foregoing acts of Defendants are intended to cause, have caused, and are likely to continue to cause confusion and to deceive consumers, the public, and the trade into believing that Defendants' Counterfeit Products are genuine or authorized products of Springboard.

95.     Upon information and belief, Defendants have acted with knowledge of Springboard's ownership of the Springboard brand and Trademarks and with deliberate intention or reckless disregard to unfairly benefit from the incalculable goodwill inherent in the Springboard brand and Trademarks.

96.     Defendants' acts constitute trademark counterfeiting in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114).

97.     Upon information and belief, Defendants have made and will continue to make substantial profits and gains to which they are not in law or equity entitled.

98.     Upon information and belief, Defendants will continue its infringing acts, unless restrained by this Court.

99.     Defendants' acts have damaged and will continue to damage Springboard, and Springboard has no adequate remedy at law.

100.    In light of the foregoing, Springboard is entitled to and demands injunctive relief prohibiting Defendants from using the Springboard brand and Trademarks that are identical, substantially indistinguishable, and/or confusingly similar thereto for any purpose, and to recover from Defendants all damages, including attorneys' fees, that Springboard has

sustained and will sustain as a result of such infringing acts, and all gains, profits, and

advantages obtained by Defendants as a result thereof, in an amount not yet known, as well

as the costs of this action pursuant to 15 U.S.C. § 1117(a), attorneys' fees and treble damages

pursuant to 15 U.S.C. § 1117(b), and/or statutory damages pursuant to 15 U.S.C. § 1117(c).

## SECOND CLAIM FOR RELIEF

### (Trademark Infringement — 15 U.S.C. § 1114)

101.    Springboard incorporates herein by reference the averments of the preceding

paragraphs as though fully set forth herein.

102.    The Springboard brand and Trademarks are nationally recognized, as being

affixed to goods and merchandise of the highest quality and originating with Springboard.

103.    The registration embodying the Springboard brand and Trademarks is in full

force and effect, and is entitled to protection under both federal law and common law.

104.    Defendants' unauthorized use of the Springboard brand and Trademarks in

interstate commerce and advertising of the same constitutes false designation of origin and a

false representation that the goods and services are manufactured, offered, sponsored,

authorized, licensed by or otherwise connected with Springboard, or come from the same

source as Springboard and are of the same quality as goods bearing the Springboard brand and Trademarks.

105.    Defendants' use of the Springboard brand and Trademarks is without Springboard's permission or authority and is in total and willful disregard of Springboard's rights to control its trademarks.

106.    Defendants' activities are likely to lead to and result in confusion, mistake, or deception and are likely to cause the public to believe that Springboard has produced, sponsored, authorized, licensed, or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of Springboard.

107.    Upon information and belief, Defendants' acts are deliberate and intended to confuse the public as to the source of Defendants' goods or services and to injure Springboard and reap the benefit of Springboard's goodwill associated with the Springboard brand and Trademarks.

108.    As a direct and proximate result of Defendants' willful and unlawful conduct, Springboard has been damaged and will continue to suffer damage to its business and

reputation unless Defendants are restrained by this Court from infringing the Springboard brand and Trademarks.

109.    Defendants' acts have damaged and will continue to damage Springboard, and Springboard has no adequate remedy at law.

110.    In light of the foregoing, Springboard is entitled to injunctive relief prohibiting Defendants from using the Springboard brand and Trademarks or any marks identical and/or confusingly similar thereto for any purpose, and to recover from Defendants all damages, including attorneys' fees, that Springboard has sustained and will continue to sustain as a result of such infringing acts, and all gains, profits, and advantages obtained by Defendants as a result thereof, in an amount not yet known, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a), attorneys' fees and treble damages pursuant to 15 U.S.C. § 1117(b), and/or statutory damages pursuant to 15 U.S.C. § 1117(c).

## THIRD CLAIM FOR RELIEF

**(False Designations of Origin False Descriptions — 15 U.S.C. § 1125(a))**

111.    Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

112.    The Springboard brand and Trademarks are nonfunctional, inherently distinctive, and have achieved a high degree of consumer recognition and serve to identify Springboard as the source of high-quality goods to which the Springboard brand and Trademarks are well known and have gained fame across the country.

113.    Defendants' promotion, advertising, distribution, sale, and/or offering for sale of the Counterfeit Products is likely to confuse, mislead, or deceive consumers, the public, and the trade as to the origin, source, sponsorship, or affiliation of said products, and is intended, and is likely, to cause such parties to believe, in error, that the Defendants' Counterfeit Products have been authorized, sponsored, approved, endorsed, or licensed by Springboard, or that Defendants are in some way affiliated with Springboard.

114.    Defendants' use of the Springboard brand and Trademarks is without Springboard's permission or authority and is in total and willful disregard of Springboard's rights to control the Springboard brand and Trademarks.

115.    Defendants' acts have damaged and will continue to damage Springboard, and Springboard has no adequate remedy at law.

116.     In light of the foregoing, Springboard is entitled to injunctive relief prohibiting Defendants from using the Springboard brand and Trademarks, or any marks confusingly similar thereto, and to recover all damages, including attorneys' fees, that Springboard has sustained and will sustain, and all gains, profits, and advantages obtained by Defendants as a result of their infringing acts alleged above in an amount not yet known, as well as the costs of this action.

## **FOURTH CLAIM FOR RELIEF**

### **(Trademark Di1ution — 15 U.S.C. § 1125(e))**

117.     Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

118.     The Springboard brand and Trademarks are strong and distinctive marks and have achieved notoriety and widespread public recognition, and are thus "famous" within the meaning of the Lanham Act.

119.     Defendants have used, in commerce, in connection with the sale of the Counterfeit Products, unauthorized reproductions of the Springboard brand and Trademarks, which are likely to cause, and most likely have caused, confusion or mistake as to the

affiliation, connection, or association between Defendants and Springboard, or as to the origin, sponsorship, or approval of said Counterfeit Products by Springboard.

120.    Defendants' acts described above have diluted and continue to dilute the unique and distinctive Springboard brand and Trademarks.  These acts violate the Lanham Act, have injured and, unless immediately restrained, will continue to injure Springboard, causing damage to Springboard in an amount to be determined at trial, as well as irreparable injury to the goodwill and reputation associated with the Springboard brand and Trademarks.

121.    Upon information and belief, Defendants' unlawful actions began after the Springboard brand and Trademarks became famous.

122.    Upon information and belief, Defendants acted knowingly, deliberately, and willfully with the intent to trade on the reputation of Springboard, and to dilute the Springboard brand and Trademarks.  Defendants' conduct is willful, wanton, and egregious.

123.    Springboard has no adequate remedy at law to compensate Springboard fully for the damages that have been caused and which will continue to be caused to Springboard by Defendants' unlawful acts, unless they are enjoined by this Court.

124.    In light of the foregoing, Springboard is entitled to injunctive relief prohibiting Defendants from using the Springboard brand and Trademarks, and to recover all damages, including attorneys' fees, that Springboard has sustained and will sustain, and all gains, profits, and advantages obtained by Defendants as a result of their infringing acts alleged above in an amount not yet known, as well as the costs of this action.

## FIFTH CLAIM FOR RELIEF

### (Texas Anti-Dilution Statute — Tex. Bus. & Com. Code § 16.103)

125.    Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

126.    The Springboard brand and Trademarks are claimed and explained as set forth above.

127.    Due to Springboard's extensive sales of products bearing the Springboard brand and Trademarks, and significant marketing and promotional activities of the Springboard brand and Trademarks, the Springboard brand and Trademarks have achieved widespread acceptance and recognition among the consuming public and the trade throughout the United States and abroad.

128.    Through Springboard's prominent, long, and continuous use in commerce, including commerce within Texas, the Springboard brand and Trademarks have become and continue to be famous and distinctive.

129.    Springboard's arbitrary and distinctive Springboard brand and Trademarks identify Springboard as the source/origin of the goods on which they appear.

130.    After the Springboard brand and Trademarks became famous, Defendant, without authorization from Springboard, began using marks that are confusingly similar to the Springboard brand and Trademarks.  Defendants' use of unauthorized reproductions of the Springboard brand and Trademarks dilutes and/or is likely to dilute the distinctive quality of those marks and to lessen the capacity of such marks to identify and distinguish Springboard's products. Defendants' unlawful use of the Springboard brand and Trademarks in connection with their inferior products also is likely to tarnish the Springboard brand and Trademarks and cause blurring in the minds of consumers between Springboard and Defendant, thereby lessening the value of the Springboard brand and Trademarks as unique identifiers of Springboard's products.

131.     By the acts described above, Defendants have caused and will continue to cause irreparable injury to Springboard's goodwill and business reputation, in violation of the Texas Anti-Dilution Statute, Tex. Bus. & Com. Code § 16.103.

132.     The acts of Defendants alleged in Paragraphs 1-62 above were committed willfully, with full knowledge of Springboards' rights and with the intention of deceiving and misleading the public and causing harm to Springboards.

133.     As a direct and proximate result of Defendants' unlawful acts, Springboards has suffered and will continue to suffer damages in an amount that is not presently ascertainable, but will be established at trial.

134.     In light of the foregoing, Springboard is entitled to injunctive relief prohibiting Defendants from using the Springboard brand and Trademarks, and to recover all damages, including attorneys' fees, that Springboard has sustained and will sustain, and all gains, profits, and advantages obtained by Defendants as a result of their infringing acts alleged above in an amount not yet known, and the costs of this action.

## **SIXTH CLAIM FOR RELIEF**

### **(Common Law Trademark Infringement)**

135.     Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

136.     Springboard owns all rights, title, and interest in and to the Springboard brand and Trademarks, including all common law rights in such marks.

137.     Defendant, without authorization from Springboard, has used and is continuing to use spurious designations that are identical to, substantially indistinguishable from, or confusingly similar to the Springboard brand and Trademarks.

138.     The foregoing acts of Defendants are intended to cause, have caused, and are likely to continue to cause confusion, mistake, and deception among consumers, the public, and the trade as to whether Defendants' Counterfeit Products originate from, or are affiliated with, sponsored by, or endorsed by Springboard.

139.     Defendants' acts constitute trademark infringement in violation of the common law of the State of Texas.

140.     Upon information and belief, Defendants have profited from its unlawful actions and have been unjustly enriched to the detriment of Springboard. Defendants'

unlawful actions have caused Springboard damage in an amount presently unknown, but in an amount to be determined at trial.

141.     Springboard has been irreparably harmed and will continue to be irreparably harmed as a result of Defendants' unlawful acts unless Defendants are permanently enjoined from its unlawful conduct.

142.     Springboard has no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF

### (Common Law Unfair Competition)

143.     Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

144.     By the acts described above, Defendants have engaged in unfair competition in violation of the common law of the State of Texas.

145.     Defendants' unlawful acts are causing great and irreparable injury to Springboard, and will continue to irreparably harm Springboard unless enjoined.

146.    Upon information and belief, Defendants have profited from their unlawful actions and have been unjustly enriched to the detriment of Springboard. Defendants' unlawful actions have caused Springboard damage in an amount presently unknown, but in an amount to be determined at trial.

## EIGTH CLAIM FOR RELIEF

### (Civil-RICO Mail & Wire Fraud — 18 U.S.C. § 1962(c))

147.    Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

148.    The mail and interstate wire communications used in furtherance of this scheme were the general mailing and electronic communication described above, offering infringing counterfeit versions of Plaintiff's products for sale, reproduction and distribution by Defendants, plus specific communications, of which records are in the sole possession of Defendants.

149.    The fraudulent representations complained of here were relied on by Plaintiff's customers and potential customers, who made purchasing decisions in reliance on the fraud perpetrated by Defendants including fraudulent statements, of which records are in the sole possession of Defendants.

150.    The actions of the Individual Defendants and ESC, as set forth in detail above, comprise a fraudulent scheme to unfairly increase Defendants' sales and distribution and impede competition including Plaintiff's, using mail and interstate wire, as set forth with specificity above.

151.    Plaintiff suffered injury to its businesses and property, and damages, as set forth in detail above.

152.    Defendants' pattern of unlawful actions are violative of 18 U.S.C. § 1962(c), causing injury to Plaintiffs as contemplated by 18 U.S.C. § 1964(c), as set forth above.

153.    Plaintiffs are entitled to relief, including damages, treble damages, and reasonable attorney fees under the civil-RICO statues.

154.    Plaintiff also suffered injury to its business and property, and damages, including, but not limited to, lost sales to potential customers and to existing and potential authorized distributors of its products, in reliance on Defendants' fraudulent scheme and (implied or explicit) assertions of trademark rights.

## NINTH CLAIM FOR RELIEF

**(Civil-RICO Conspiracy — 18 U.S.C. § 1962(d))**

155.     Springboard incorporates herein by reference the averments of the preceding paragraphs as though fully set forth herein.

156.     Defendants conspired to violate 18 U.S.C. § 1962(c).  Defendants were in agreement to engage in mail and wire fraud and execute their scheme through mail and wire fraud. Defendants committed multiple overt acts in furtherance of their agreement to engage in mail and wire fraud and execute their scheme through mail and wire fraud.

157.     Defendants were in agreement to use the U.S. Mail to fraudulently reproduce Plaintiff's Trademark items and use the U.S. Mail to distribute amongst themselves and their affiliates the counterfeit items.  Defendants also exchanged emails and communications through the internet to deprive Plaintiff from selling its Trademark items to the end-users; emails and communications that fraudulently represented either Plaintiff's consent or misrepresented Defendants' lack of authorized use, sale, redistribution and reproduction.  Defendants were in agreement to use the U.S. Mail to order and have produced the counterfeit items from unwitting third parties.  Defendants exchanged emails and communications through the internet to execute their agreement to destroy and purge documents, communications and references to Plaintiff's Trademarked items and Defendants' use of counterfeits.  Defendants exchanged emails and communications through the internet and the U.S. Mail to direct subordinates to refrain from

purchasing Plaintiff's products.  Defendants exchanged emails and communications through the

internet and the U.S. Mail to agree to violate Plaintiff's intellectual property rights and to execute

that agreement.  All of Defendants' acts caused injury to Plaintiff, i.e., Plaintiff's damages and

injury were the result of Defendants' agreement and execution to use the U.S. Mail and internet

to engage in unlawful conduct.

158.    Defendants conspired to violate 15 U.S.C. § 1125(a), 15 U.S.C. § 1125(e), 15

U.S.C. § 1114, and Tex. Bus. & Com. Code § 16.103, through a pattern of racketeering.

159.    Defendants were in agreement to disregard and wholly ignore 15 U.S.C. § 1125(a),

15 U.S.C. § 1125(e), 15 U.S.C. § 1114, Tex. Bus. & Com. Code § 16.103, and any other law

protective Plaintiff's rights and instead to use Plaintiff's property for their own benefit.

160.    Defendants were in agreement to use counterfeit items for themselves and to

distribute amongst themselves and their affiliates the counterfeits.  Defendants exchanged emails

and other communications through U.S. Mail and the internet in furtherance of their agreement.

Defendants exchanged emails and other communications through U.S. Mail and the internet that

fraudulently represented to consumers and end-users that Defendants' counterfeit items were their

own without regard to Plaintiff's rights.  Defendants were in agreement to order and have

produced the counterfeit items from unwitting third parties.  Defendants exchanged emails and

communications through the internet and the U.S. Mail to direct subordinates reproduce the

counterfeits in lieu of purchasing from Plaintiff.  All of Defendants' acts caused injury to Plaintiff,

i.e., Plaintiff's damages and injury were the result of Defendants' agreement and execution of

their agreement.

## PRAYER FOR RELIEF

161.    WHEREFORE, Springboard respectfully prays that this Court enter judgment

in its favor and against Defendants as follows:

162.    Defendants, their agents, servants, employees, officers, associates, attorneys,

and all persons acting by, through, or in concert with any of them, are hereby temporarily,

preliminarily, and permanently enjoined from using the Springboard brand and Trademarks,

including, but not limited to: manufacturing, importing, advertising, marketing, promoting,

supplying, distributing, offering for sale, or selling any products which bear the Springboard

brand and Trademarks or any marks/designs identical, substantially indistinguishable,

substantially similar, and/or confusingly similar thereto;

163.     Engaging in any other activity constituting unfair competition with Springboard, or acts and practices that deceive consumers, the public, and/or trade, including without limitation, the use of designations and design elements associated with Springboard;

164.     Engaging in any other activity that would dilute the distinctiveness of the Springboard brand and Trademarks; and

165.     Committing any other act which falsely represents or which has the effect of falsely representing that the goods and services of Defendants are licensed by, authorized by, offered by, produced by, sponsored by, or in any other way associated with Springboard;

166.     Ordering Defendants to recall from any distributors and retailers, and to deliver to Springboard for destruction or other disposition all remaining inventory of Counterfeit Products, or other printed/published material bearing the Springboard brand and Trademarks, or any marks confusingly similar or substantially similar thereto, including all advertisements, promotional and marketing materials therefore, as well as the means of making the same;

167.    Ordering Defendants to file with this Court and serve on Springboard within ten (10) days after entry of the injunction a report in writing, under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

168.    Ordering Defendants to disclose their supplier(s) and manufacturer(s) of the Counterfeit Products and provide all documents, correspondence, receipts, and invoices associated with the purchase of the Counterfeit Products;

169.    Ordering an accounting by Defendants of all gains, profits, and advantages derived from their wrongful acts;

170.    Awarding Springboard all of Defendants' profits and all damages sustained by Springboard as a result of Defendants' wrongful acts, and such other compensatory damages as the Court determines to be fair and appropriate pursuant to 15 U.S.C. § 1117(a) and 17 U.S.C. § 504(b);

171.    Awarding treble damages in the amount of Defendants' profits or Springboard's damages, whichever is greater, for willful infringement pursuant to 15 U.S.C. § 1117(b);

172.     Awarding applicable interest, costs, disbursements, and attorneys' fees pursuant to 15 U.S.C. § 1117(b), 17 U.S.C. § 505, and 18 U.S.C. § 1964(c);

173.     Awarding Springboard statutory damages pursuant to 15 U.S.C. § 1117(c) and 17 U.S.C. § 504(c);

174.     Awarding Springboard punitive damages in connection with its state law claims, on account of Defendants' willful misconduct and fraud and deceit upon the public; and

175.     Awarding any other injunctive and other equitable relief, under federal civil-RICO and any other remedies authorized by law.

176.     Such other relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Springboard hereby demands a trial by jury of all claims in this litigation.

Dated: January 6, 2017                    Respectfully Submitted,

                                          **DELEON LAW GROUP PC**

RUBEN C. DELEON
STATE BAR NO. 00790577
15851 DALLAS PARKWAY
SUITE 600
ADDISON, TEXAS 75001
TELEPHONE:   214-561-8687
FACSIMILE:    877-488-8983

**ATTORNEY FOR PLAINTIFF**
**SPRINGBOARDS TO**
**EDUCATION, INC.**